**Jacobini, Admr. v.**
**International Business Machines Corp.**

*John J. McNally, Jr.*, for plaintiff.
*Thomas E. Byrne, Jr.*, for defendant.

DiBONA, J., May 9, 1972.—In December of 1964, Albert Jacobini was killed when a wheelbarrow plummeted 15 floors from a hoist adjoining a partially completed building on which he was working and struck him on the head. In January of 1972, a jury returned a verdict of $160,000 against International Business Machines Corporation (IBM), owner of the building.

It is undisputed that the wheelbarrow would not have fallen if the contractor had enclosed the elevator shaft with wire mesh as required by applicable safety requirements. See Regulation 274 of the Pennsylvania Department of Labor and Industry in Reference to Elevators, Escalators, Dumbwaiters, and Hoists (1962 ed.). It is also uncontroverted that the contractor's failure to enclose the shaft constituted negligence per se. See Majors v. Brodhead Hotel, 416 Pa. 265 (1965). The sole issue presented by IBM in its motion for judgment n.o.v., which was heard orally and denied, is whether it can be held liable for the contractor's negligence under the concept of liability set forth in section 416 of the Restatement of Torts, 2d.

The undisputed facts are as follows. IBM engaged the Basic Construction Company (Basic), a reliable contractor, to construct an office building in center city Philadelphia. Among the provisions of their contract was a clause requiring Basic to comply with all safety requirements. IBM also employed Walter Cozzens as a field engineer.[1] His duties included the

---

[1] We do not hold that Cozzens was anything other than an independent contractor. Nor, do we hold that Cozzens' presence at the job site indicated that IBM had retained control of the project within the meaning of section 414 of the Restatement of Torts, 2d. As will be discussed, infra, testimony regarding Cozzens' duties was introduced solely for the purpose of establishing knowledge on the part of IBM.

responsibility of insuring that Basic did in fact comply with these requirements.

During the course of construction, two elevator shafts were erected. One was enclosed with wire mesh; the other was not enclosed. At first, a bucket hoist was installed in the unenclosed shaft to haul concrete. This use did not require wire meshing and accordingly it was approved by an elevator inspector. Approximately two months before the accident, however, a platform hoist was substituted for the bucket hoist, and the contractor failed to enclose the shaft as mandated under the safety regulations.

Cozzens testified that he was aware of the installation of the platform hoist. He knew that wire meshing was required and so advised Basic's superintendent. Nevertheless, neither Cozzens nor defendant ordered that the shaft be shut down. Indeed, this order was not forthcoming until an inspector from the medical examiner's office visited the site after Jacobini's death.

Jacobini was employed by the Roman Mosaic Company, a subcontractor. On the day of the accident, his assignment was to load wheelbarrows onto the platform hoist and send them to the fifteenth floor. A coemploye, Carmen Romano, would empty the wheelbarrows and send them back to Jacobini. Romano testified that he removed one of the wheelbarrows, walked 50 feet to empty it, then placed it on the platform by standing it on its back legs. He repeated this procedure with the second wheelbarrow. When he returned to the platform, he discovered the first wheelbarrow had fallen.

The thrust of IBM's argument is twofold. First, it urges that an imputation of liability on its part must be supported by evidence that it was in control of the project. Secondly, it argues that section 416 of the Restatement of Torts, 2d, is inapposite inasmuch as

the condition which ultimately caused the death of Albert Jacobini is one which could not be appreciated when IBM and Basic executed their contract. We find both of these positions contrary to our interpretation of the applicable law.

IBM supports its first position by relying on Fisher v. United States, 441 F. 2d 1288 (1971). In Fisher the Third Circuit Court of Appeals held that section 318 of the Restatement of Torts, 2d, was not intended to encompass large scale construction sites since the owner cannot be deemed to be "in possession." IBM supplements its argument by maintaining that the retention of control by the owner is a sine qua non to the imputation of liability. A perusal of the respective provisions of the Restatement indicates that IBM's position is untenable. Section 318 contains the important qualification that the owner must be "present." This factor imparts the ability to control the actor's conduct. (See Restatement of Torts, 2d, §318, comment b (1965). There is no similar limitation inserted in section 416. This section is not grounded in the active negligence of the owner: it imposes vicarious liability based on the nature of the task to be performed and the dangers inherent in the work unless special precautions be taken.[2] Consequently, issues such as whether the employer was present or in control of the project should properly be precluded from consideration. Accordingly, we conclude that neither Fisher v. United States, supra, nor related State court opinions, e.g., Crane v. I.T.E. Circuit Breaker Co., 443 Pa. 442 (1971), are dispositive of the issues at hand.

---

[2] The distinction, as we see it, is between conduct which is not dangerous unless active negligence occurs in the performance of the act, and a dangerous condition inherent in the work which poses a substantial risk of harm unless special precautions are taken.

IBM's second theory is that section 416 applies only if the peculiar risk of physical harm is appreciated by the parties when the contract is executed. IBM would thus deny liability on the ground that it could not have foreseen the conversion of the hoist to its illegal and lethal usage.

Although section 416 has been adopted by our courts, no case decided to date addresses itself to this specific issue. Brletich v. U.S. Steel Corp., 445 Pa. 525 (1971), is similar in the sense that it involved a large-scale construction project and at first glance appears determinative. Nevertheless, Brletich is distinguishable inasmuch as the negligent conduct, i.e., the operation of a crane in such a manner as to cause it to jerk, did not emanate from a condition bearing an unusual risk of physical harm. Instead, it was ordinary negligence: conduct which could only result in harm if negligently performed. As to this type of negligence, section 416 would not apply. See Restatement of Torts, 2d, §416, comment d (1961). In marked contrast, the operation of a hoist which is not enclosed with meshing as dictated by regulation involves intrinsically a peculiar risk of physical harm no matter how carefully one might operate it. We would be inclined to hold otherwise if the accident in the case at bar resulted from ordinary negligence, e.g., if a worker negligently dropped a bucket of cement while removing it from the bucket hoist. But, to posit that the operation of an unenclosed elevator is not dangerous in and of itself seems totally disoriented from realistic and reasonable concepts of responsibility.

We doubt that IBM can dispute this reasoning. It does, however, strenuously urge that the purported risk was not cognizable when it executed its contract with Basic. We disagree. IBM knew or should have known that the construction of the building would necessarily involve the installation and operation of

numerous elevator hoists to haul materials to the upper floors. And it possessed a nondelegable duty to insure that all safety precautions were met; a duty which is not satisfied contractually. Indeed, section 416 applies even though the contract specifically requires the contractor to guard against the danger.

Assuming arguendo that IBM is correct, of what moment is Cozzens' awareness that the hoist was being operated illegally? Although his presence at the job site may not establish control by IBM, Hader v. Coplay Cement Manufacturing Co., 410 Pa. 139 (1963), it certainly establishes knowledge. Can an owner learn, albeit constructively, that a contractor has failed to comply with safety requirements which he is contractually bound to undertake yet sit idly? We think not. See Restatement of Torts, 2d, §413, comment d (1965). Accordingly, we conclude that IBM's assertion of non-liability is unfounded and deny its motion for judgment.